**WASHINGTON GAS LIGHT COMPANY,**
**Appellee,**

v.

**VIRGINIA ELECTRIC AND POWER**
**COMPANY, Appellant.**

**No. 14605.**

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 9, 1970.

Decided Feb. 12, 1971.

Milton Handler, New York City (Michael D. Blechman, and Kaye, Scholer, Fierman, Hays & Handler, New York City, George D. Gibson, Lewis T. Booker, Michael W. Maupin, and Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., on brief), for appellant.

Herbert A. Bergson, Washington, D. C. (Howard Adler, Jr., Norman G. Knopf, Bergson, Borkland, Margolis & Adler, John J. Wilson, and Whiteford, Hart, Carmody & Wilson, Washington, D. C., James H. Simmonds, and Simmonds, Coleburn, Towner & Carman, Arlington, Va., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, MURRAH, Senior Circuit Judge,* and CRAVEN, Circuit Judge.

CRAVEN, Circuit Judge:

This is an appeal from a decision of the district court holding certain practices of the Virginia Electric and Power Company (VEPCO) to be per se violations of Section I of the Sherman Act, 15 U.S.C. § 1, and also violations of Section 3 of the Clayton Act, 15 U.S.C. § 14. Two issues are presented to us either of which may be decisive of the appeal. One is whether the complained of practices by VEPCO are "state action" and therefore exempt from the purview of federal antitrust legislation. Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L. Ed. 315 (1943). The other is whether VEPCO sold only one product, electricity, so as to take the case out of the tie-in doctrine of Fortner Enterprises, Inc. v. United States Steel Corporation, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). We decide both issues in favor of VEPCO and reverse.

I.

VEPCO is a state regulated utility supplying electricity to areas of Virginia also served by the plaintiff gas utility, Washington Gas Light Company. Prior to 1960, practically all residences served by VEPCO obtained electrical power

---

* Of the Tenth Circuit, sitting by designation.

through overhead distribution lines. These lines were relatively inexpensive to install and were provided by VEPCO at no charge to new home builders. Early in the 1960's installation of underground service lines became increasingly popular. Until 1963, VEPCO agreed to install "underground residential distribution" (URD) lines instead of the common overhead variety if the builder agreed to pay the additional expenses involved, usually amounting to a sum around $280.

In 1963 VEPCO began the first in a series of all-electric house plans designed to make it more attractive for the builder to install electric appliances in their new homes to the exclusion of the competing utility—natural gas. Washington Gas Light Company complains that these programs violated the Sherman and Clayton Acts. The district court's findings reveal that the first plans offered URD installation free of charge if the builder went "all electric," or at a substantially reduced rate if he went all electric except for heating and provided his own trenching and backfilling.

The state legislature in 1966 by statutory amendment specifically required Virginia's utility regulatory body, the State Corporation Commission (SCC), to investigate the "promotional allowances and practices of public utilities and [to] * * * take such action as such investigation may indicate to be in the public interest."[1] After the Commission's subsequent disapproval of the earlier VEPCO plans, new programs were instituted giving credit on URD installation based on anticipated electrical usage. The anticipated consumption was computed through tables listing annual kilowatt hours used by various home appliances. The larger the estimated usage, the larger the credit against URD installation charges. The practical effect of

going all electric under the new plan was the same as under the old—the credit given for residences going "all electric" was usually sufficient to cover the entire cost of URD installation. Subsequently, VEPCO's base installation charges were considerably reduced and remained in effect until March of 1970 when the lower court's prohibition became effective.[2]

The result of VEPCO's installation campaign was that significant inroads were made into areas previously dominated by the use of natural gas—home heating, water heating, and cooking.

■ The district court found the VEPCO plans per se violations of Section I of the Sherman Act as illegal "tying arrangements" and also violations of Section 3 of the Clayton Act as exclusive dealing arrangements without consideration of the *Parker, supra,* exemption. It is urged upon us that since the district court did not consider the application of *Parker,* neither should we. Desert Palace, Inc. v. Salisbury, 401 F. 2d 320, 323–324 (7th Cir. 1968). We think the rigid application of such a rule of procedure is inappropriate where the record provides an adequate basis for consideration on the merits. As the Supreme Court stated in Hormel v. Helvering, 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941):

> Rules of practice and procedure are devised to promote the ends of justice, not to defeat them. A rigid and undeviating judicially declared practice under which courts of review would invariably and under all circumstances decline to consider all questions which had not previously been specifically urged would be out of harmony with this policy. Orderly rules of procedure do not require sacrifice of the rules of fundamental justice.

---

1. Va.Code Ann. § 56–247 (1969).

2. In April of 1970 the SCC issued an order prohibiting all promotional allowances of utilities, but allowed commitments made under prior plans to be fulfilled. Thus our decision is of no great consequence for the future. Presumably VEPCO has discontinued the practices which are the basis for this suit.

Accord, Dudley v. Inland Mutual Insurance Co., 299 F.2d 637 (4th Cir. 1962). Indeed, if deemed necessary to reach the correct result, an appellate court may *sua sponte* consider points not presented to the district court and not even raised on appeal by any party. See, e. g., United States v. Continental Can Co., 378 U. S. 441, 457, 470, 84 S.Ct. 1738, 12 L.Ed. 2d 953 (1964). In *Parker* the Court held a 1940 California raisin marketing program conducted by a state commission permissible even assuming the action would have been violative of the antitrust laws had the same plan been adopted by private individuals operating outside the state's direction.

We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. * * * [I]t is the state, acting through the Commission, which adopts the program and which enforces it with penal sanctions, in the execution of a governmental policy.

317 U.S. at 350–352, 63 S.Ct. at 313–314.

■ To find shelter under *Parker*, the acts complained of must be the result of state action, either by state officials or by private individuals "under the active supervision" of the state, Allstate Insurance Company v. Lanier, 361 F.2d 870, 872 (4th Cir. 1966),[3] although proposals may originate privately if their execution depends on state regulation or actual state implementation. *Parker, supra,* 317 U.S. at 352, 63 S.Ct. at 307.

The teaching of *Parker v. Brown* is that the antitrust laws are directed against individual and not state ac-

tion. When a state has a public policy against free competition in an industry important to it, the state may regulate that industry in order to control or, in a proper case, to eliminate competition therein. It may even permit persons subject to such control to participate in the regulation, provided *their activities are adequately supervised by independent state officials.* Asheville Tobacco Board of Trade, Inc. v. FTC, 263 F.2d 502, 509 (4th Cir. 1959).

■■ If the exemption is to be applied to a regulated industry, such as a state utility, then it can extend only to those activities which fall under state supervision. See Wainwright v. National Dairy Products, Corp., 304 F.Supp. 567, 574–575 (N.D.Ga.1969). The regulatory agency must be a creature of the state and not one whose activities are governed by private agreement without any real state control. Sun Valley Disposal Co. v. Silver State Disposal Co., 420 F.2d 341, 342 (9th Cir. 1969); E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority, 362 F.2d 52, 55 (1st Cir. 1966); Allstate Insurance Co. v. Lanier, *supra.*

■ The Virginia State Corporation Commission is without question a proper state agency to qualify under *Parker*. Section 155 of the Virginia State Constitution makes explicit provision for the SCC giving it the power, among other things, to prescribe utility rates and, subject to the authority of the state legislature, to regulate other non-specified corporate utility activities. Sections of the Virginia Code provide a detailed system of regulatory powers and procedures whereby administrative action may be taken and reviewed with respect to "rates, tolls, charges, schedules," etc.[4]

---

3. See also Woods Exploration & Production Company v. Aluminum Company of America, 284 F.Supp. 582, 588–589 (S.D. Tex.1968).

4. § 56–235. When Commission may fix rates, schedules, etc.—If upon investigation the rates, tolls, charges, schedules,

or joint rates of any public utility operating in this State shall be found to be unjust, unreasonable, insufficient or unjustly discriminatory or to be preferential or otherwise in violation of any of the provisions of law, the State Corporation Commission shall have power to fix and order substituted therefor such rate

■ ■ There can be no doubt, and in fact Washington Gas Light does not argue to the contrary, that the SCC is a regulatory arm of the state, possessing both the authority and powers necessary to qualify under *Parker*. Instead, the gas company argues that even though the SCC was aware of VEPCO's URD activities before 1966, it made no investigations and gave no affirmative approval (or disapproval) of the VEPCO plans, and that VEPCO's conduct was therefore "individual" and not "state" action. The argument is not without merit but the conclusion is not inevitable unless one equates administrative silence with abandonment of administrative duty. It is just as sensible to infer that silence means consent, i. e., approval. Indeed, the latter inference seems the more likely one when we remember that even the gas company concedes that the SCC possessed adequate regulatory powers to stop VEPCO if it chose to do so, and that eventually SCC spoke affirmatively and first modified and finally ended the promotional practices upon which the suit was based. The antitrust laws are a poor substitute, we think, for plaintiff's failure to promptly protest to the SCC and to seek the administrative remedy ultimately shown to have been available and effective. We think VEPCO's promotional practices were at all times within the ambit of regulation and under the control of SCC, and we hold these practices exempt from the application of the laws of antitrust under the *Parker* doctrine.

## II.

■ "There is, at the outset of every tie-in case, including the familiar cases involving physical goods, the problem of determining whether two separate products are in fact involved." *Fortner Enterprises v. United States Steel Corporation*, 394 U.S. 495, 507, 89 S.Ct. 1252, 1260, 22 L.Ed.2d 495 (1969).

Alternatively, we rest our decision upon the very difficult determination of

or rates, tolls, charges or schedules as shall be just and reasonable. (Code 1919, § 4071.)

§ 56–236. Public utilities required to file, etc., schedules of rates and charges; rules and regulations.—Every public utility shall be required to file with the Commission and to keep open to public inspection schedules showing rates and charges, either for itself, or joint rates and charges between itself and any other public utility. Every public utility shall file with, and as a part of, such schedules, copies of all rules and regulations that in any manner affect the rates charged or to be charged. (Code 1919, § 4066; 1918, p. 674; 1924, p. 538; 1927, p. 123.)

§ 56–238. Suspension of proposed rates, etc.; investigation; fixing reasonable rates, etc.—The Commission, either *upon complaint or on its own motion*, may suspend the enforcement of any or all of the proposed rates, tolls, charges, rules or regulations, for a period not exceeding sixty days, during which time it shall investigate the reasonableness or justice of the proposed rates, tolls, charges, rules and regulations and thereupon fix and order substituted therefor such rates, tolls, charges, rules and regulations as shall be just and reasonable. * * * (Emphasis added) (Code 1919, § 4066; 1918, p. 674; 1924, p. 539; 1927, p. 123.)

§ 56–239. Appeal from action of Commission.—The public utility whose schedules shall have been so filed or the Commonwealth or other party in interest may appeal to the Supreme Court of Appeals from such decision or order as the Commission may finally enter. * * * (Code 1919, § 4066; 1918, p. 674; 1924, p. 539; 1927, p. 124.)

§ 56–247. Commission may change regulations, measurements, practices, services, or acts.—If upon investigation it shall be found that any regulation, measurement, practice, act or service of any public utility complained of is unjust, unreasonable, insufficient, preferential, unjustly discriminatory or otherwise in violation of law or if it be found that any service is inadequate or that any reasonable service cannot be obtained, the Commission may substitute therefor such other regulations, measurements, practices, service or acts and make such order respecting, and such changes in, such regulations, measurements, practices, service or acts as shall be just and reasonable.

The Commission shall investigate the promotional allowances and practices of public utilities and shall take such action as such investigation may indicate to be in the public interest. (Code 1919, § 4072; 1966, c. 552.)

this ultimate question of fact. In *Fortner* five members of the Supreme Court concluded that the extension of credit on favorable terms for the purchase of real property in an amount totaling over two million dollars by a wholly owned subsidiary of the United States Steel Corporation was a separate tying product resulting in compulsion to buy prefabricated buildings (to be erected on the purchased property) from United States Steel. Although the Court did not lay down any general test for finding two products in a given case, it did discuss various factors which may have entered into the decision, including these:

1. The credit offered and the prefabricated buildings were each supplied by a separate corporation.[5]

2. The tied product (prefabricated buildings) were sold at an artificially high price—some $400 more than a competitive product of similar quality.

3. The credit obtained was in excess of that needed to purchase the desired real property, and included enough to finance the artificially inflated cost of prefabricated houses.

4. The loans totaling over two million dollars could not be obtained on any terms unless the prefabricated homes were bought exclusively from United States Steel Corporation.

5. The price of the tied product, prefabricated buildings, was not a regulated price, and United States Steel was as free to further its market penetration by price reduction as by offering uniquely advantageous credit.

It seems to us that VEPCO sold only one product—electricity. The delivery of that product has always been an ancillary and necessary part of the business of producing and selling electrical power. This was simply a new method of delivery but paid for in the old way, i. e., "free" to the customer. There was no separate market for the installation of underground wiring as there was a separate market for credit in *Fortner*. That there are not dual markets strongly suggests there are not separate products. See Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 614, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

Even in *Fortner*, four members of the Court thought that United States Steel was selling one product, namely prefabricated buildings, and that the provision of credit on a large scale to finance the purchase of land (not just the buildings) was simply an ancillary service in connection with making the sale. The dissenters noted that

> [a]lmost all modern selling involves providing some ancillary services in connection with making the sale—*delivery, installation,* supplying fixtures, servicing, * * *. Customarily—indeed almost invariably—the seller offers these ancillary services only in connection with the sale of his own products, and they are often offered without cost or at bargain rates.

394 U.S. at 525, 89 S.Ct. at 1270. (Emphasis added.)

Unlike United States Steel's inflated price of the tied product (prefabricated homes) VEPCO's rates for home heating and consumption of electricity, although higher than the rates for gas which would do the same job, were not arbitrarily inflated but had been approved by the Corporation Commission. There was nothing "artificial" about the price

---

5. 394 U.S. at 507, 89 S.Ct. 1252.
   The Court recognized that in some situations a credit offer may be legitimately connected with the sale of a product as "an inseparable part" of the transaction. But it distinguished the Fortner transaction as clearly involving two products because of two facts: the loan and the tied goods were sold by separate corporations, and the loan was for an amount larger than that needed to pay the seller of the tied product.
   The Supreme Court, 1968 Term, 83 Harv. L.Rev. 7, 244 (1969).

of electricity as there was with respect to the price of the prefabricated homes.

Finally, the ultimate effect of the *Fortner* type monopoly was to sell the tied prefabricated homes at an artificial inflated price in a market where the same identical prefabricated houses of similar quality could have been obtained by the consumer at a cost $400 cheaper. Washington Gas' competing product is not identical or even necessarily of the same quality in the subjective sense. Some consumers may prefer electricity despite the greater heating efficiency of gas. Some may not want to be bothered with two monthly bills from two different companies and two problems of maintenance and repair of two different systems. Electricity is simply different from gas and may be subjectively preferred by a consumer despite its higher cost and the latter's greater efficiency. Whether such a preference, if it exists, is a permissible one in our economy can better be determined by the expertise of a regulatory agency than random application of antitrust laws.

In Gas Light Co. of Columbus v. Georgia Power Co., 313 F.Supp. 860, 869 (M.D.Ga.1970), Judge Elliott considered and discussed the decision below in this case:

> The curious thing about the opinion is the Court's assumption that underground residential distribution and electricity are two separate products, so that one can be tied to the other as computer cards were tied to IBM machines in International Business Machines Corp. v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1936). To my mind, Underground Residential Distribution is merely a method by which a product—electricity—is delivered to the consumer. It might be compared to a department store's delivery of merchandise bought by a customer living fifteen miles out in the country—if that customer bought a single necktie it is doubtful the store would treat the delivery the same way it would if the customer bought a wardrobe. Underground Residential Distribution is ancillary to both the seller and buyer of the product, in much the same way as a free meal given to an airline passenger is ancillary to the sale of an airline ticket. Therefore, it is difficult to see how there could be a separate tying product in the commercial sense, or how such a case could be fit within the tying clause concept.

With the greatest respect for the decision of the district judge, we nevertheless think that his ultimate finding of fact that there were two separate products was clearly erroneous and mistaken.

We suggest that the rationale and underlying purpose of both the Sherman and Clayton Acts is to prevent monopoly where it is not in the public interest. It has long since been established that both gas and electricity can best be produced and distributed (and the public benefited) by monopoly under state regulation. The problem here is not one of preventing monopoly as in *Fortner*, but of making lawful monopoly work best in the public interest. Doubtless, we think, SCC can do a better job than private piecemeal application of laws aimed against monopoly.

Reversed.