**NATIONAL FAMILY INSURANCE COMPANY, a Minnesota corporation, Plaintiff-Appellant,**

v.

**EXCHANGE NATIONAL BANK OF CHICAGO, a National Banking Association, Defendant-Appellee.**

No. 71–1617.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 27, 1972.

Decided Feb. 20, 1973.

Rehearing Denied March 15, 1973.

Dom J. Rizzi, Frank J. Pause, Chicago, Ill., for plaintiff-appellant.

Edgar Bernhard, Selwyn Zun, Robert W. Gettleman, Chicago, Ill., for defendant-appellee.

Before HASTINGS, Senior Circuit Judge, and FAIRCHILD and PELL, Circuit Judges.

HASTINGS, Senior Circuit Judge.

National Family Insurance Company, a Minnesota corporation (National Family), filed this action in the district court against Exchange National Bank of Chicago, a national banking association (Exchange Bank). Plaintiff is an insurance company and at all times herein concerned was 100 per cent reinsured by American Allied Insurance Company (American Allied) at a cost to plaintiff of more than $1,000,000 in premiums. American Allied was one of a group of insurance companies in Minnesota and Illinois owned and controlled by the Phillip Kitzer family. American Allied was adjudged to be insolvent by a Minnesota state court, and a receiver was appointed.

In brief, National Family seeks to recover substantial damages because of heavy losses it sustained by reason of Exchange Bank's alleged fraudulent misrepresentations of the true financial status of plaintiff's 100 per cent reinsurer, American Allied.

The instant appeal is by National Family from an order of the district court dismissing this action against Exchange Bank on the ground that it was barred by the running of the five-year Illinois statute of limitations, Illinois Revised Statutes, chapter 83, § 16 (1969), which provides that an action such as plaintiff's herein "shall be commenced within 5 years next after the cause of action accrued." Plaintiff seeks to avoid this limitation by relying on the "fraudulent concealment" exception set out in Illinois Revised Statutes, chapter 83, § 23 (1969), which provides: "If a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at any time within five years after the person entitled to bring the same discovers that he has such cause of action, and not afterwards." This action having arisen in Illinois and being based upon diversity of citizenship, the Illinois law governing limitations applies. Bernard Food Industries, Inc. v. Dietene Co., 7 Cir., 415 F.2d 1279, 1282 (1969), cert. denied, 397 U.S. 912, 90 S. Ct. 911, 25 L.Ed.2d 92 (1970).

Plaintiff filed its complaint on September 25, 1970, and its notice of demand for jury trial on September 30, 1970. On October 15, 1970, defendant raised the limitations issue by filing its motion to dismiss the complaint on the ground that it failed to state a claim against defendant upon which relief could be granted because of the five-year limitations bar raised by chapter 83, § 16, *supra*. Thereafter, each party filed numerous exhibits, affidavits, counter-affidavits, depositions and memoranda in support of and in opposition to the motion to dismiss. Subsequently, pursuant to Rule 12(b), Federal Rules of Civil Procedure, Title 28, U.S.C.A.,

defendant's motion to dismiss was treated as one for summary judgment.

On May 3, 1971, the district court filed its written opinion and order and concluded:

"The conflict that arises from the facts outlined above creates an issue that is not ripe for resolution on motion for summary judgment and would ordinarily be cause for denial. However, in view of the obviously complicated and lengthy litigation that will ensue on the trial of this cause, the court has decided to order a factual hearing solely to determine whether, in accordance with the standard set out earlier in this opinion, the statute of limitations began to run prior to September 23, 1965."

■ We have carefully reviewed the trial court's memorandum opinion of May 3, 1971. In our judgment it correctly summarizes the nature of the cause of action and the relation of parties thereto, as well as the position of American Allied and the "Kitzer Family" and its activities. The court properly treated the motion to dismiss as one for summary judgment. Sticker Industrial Supply Corp. v. Blaw-Knox Co., 7 Cir., 367 F.2d 744, 745 n.1 (1966).

■ We have examined the Illinois law cited by the trial court in its written opinion. The court correctly determined that, although the "fraudulent concealment" exception set out in chapter 83, § 23, *supra*, literally reads that the right of action for concealment of fraud remains for a period of five years from the date plaintiff actually discovers the fraud, yet the Illinois courts have applied the ordinary fraud standards to determine when the cause of action accrues. The applicable statutory period here commences at the time the plaintiff, *through ordinary diligence,* should have discovered the fraudulent actions causing its injury. "Mere silence of the defendant and mere failure on the part of the complainant to learn of a cause of action do not amount to such fraudulent concealment." Jackson v. Anderson, 355 Ill. 550, 557, 189 N.E. 924, 927 (1934).

The trial court further found that the statutory period of five years was uninterrupted. It noted the complaint charged that the Kitzers and American Allied were customers of defendant Exchange Bank for almost four years from August 1, 1961, through June 5, 1965, and from that logically assumed that all acts of fraudulent representations must have occurred within that period. Insolvency proceedings against American Allied commenced June 10, 1965. Beginning as early as April 12, 1965, and continuing on through September 21, 1965, a total of 27 newspaper articles appeared in the St. Paul-Minneapolis area (where plaintiff is located) questioning various financial dealings of American Allied and reporting a suit against defendant Exchange Bank by the receiver of American Allied. These were attached as exhibits to defendant's motion for dismissal and/or summary judgment. The court specifically found that "[t]his publicity and the insolvent condition of American Allied would alone appear to be sufficient notice."

However, because of plaintiff's counter-showing by affidavit that it was unaware of any fraud on the part of defendant Exchange Bank until 1967, the trial court wisely decided that this conflict was not ripe for summary judgment disposition.

Following the foregoing order of May 3, 1971, certain depositions were taken by plaintiff and additional documentary evidence was filed. The next hearing on the limitations issue was held before the court the afternoon of June 9, 1971. Plaintiff presented the testimony of one witness. Both parties relied on depositions previously taken. The matter was not concluded but was next resumed on the afternoon of June 23, 1971.

The hearing was resumed on the limitations issue previously considered and under the guidelines set out in the earlier order. Certain documents in the Minnesota state court insolvency matter

were admitted in evidence, and all counsel were heard at length on the issue before the court. At the conclusion of the hearing the trial court orally announced the following findings and ruling from the bench:

"The hour is late, you have argued, all of you, adequately and capably. I have read the pleadings. We have had occasion to consider the matter earlier in the context of a ruling on a motion for summary judgment.

"I take the argument today to be in support of an alternative motion to dismiss, which is based solely on the statute of limitations, and it is on that sole issue that I am prepared to rule.

"It is the finding of the Court, after the consideration of the evidence that is available to me in the form of pleadings, depositions, and other matters called to my attention, that the misrepresentations of the Exchange National Bank which are basically what is sued upon, whether directly or indirectly, relate to the financial condition of American Allied. The extent to which Exchange National Bank may be involved in any financial machinations, as they have been called here, to bring about the insolvency, or even to conceal the insolvency of American Allied, are not relevant, except as they operate to deceive National Family as to the financial condition of American Allied.

"The operative facts which put National Family on notice of their cause of action here are the evidences of insolvency of American Allied and nothing else. National's faith in the misrepresentations causing it to believe that American Allied was solvent, ripened into a cause of action when National learned, or should have learned that American Allied was insolvent. It seems clear from the evidence the beginning of that knowledge certainly should have occurred somewhere around June 10th, 1965, when National found American Allied no longer able, because of insolvency and the Court ruling, to live up to its obligations under the reinsurance contract.

"The cause of action which is asserted here, therefore, ripened into a cause of action some time in June or in any event, no later than mid-September of 1965. The complaint here was filed more than five years after that date. Therefore, the motion to dismiss filed by the defendant, based on the statute of limitations, is granted."

We have examined the record before the district court and understand the district court's interpretation thereof to mean that plaintiff's available information should have been sufficient to have put plaintiff upon notice of its cause of action at a time between June 10 and mid-September 1965. The chronology of events and publicity involving defendant Exchange Bank which, through the exercise of ordinary diligence, should have caused plaintiff National Family to have discovered the fraudulent actions causing its injury, follows:

The newspaper articles appearing on April 12, 1965, related accusations by two state legislators that the Minnesota Insurance Commissioner (later indicted with the Kitzers and three bank officers) had misused his office and that $1,000,000 of American Allied funds had been transferred to an unauthorized Chicago bank account.

In June 1965, American Allied was no longer able to pay claims on its reinsurance obligations, and National Family began to pay them itself. Insolvency proceedings against American Allied were commenced in the Minnesota state courts on June 10, 1965. On August 4, 1965, American Allied was found to be insolvent, and a receiver was appointed. In June, July and August 1965, the newspaper articles earlier mentioned informed the public in that area concerning the alleged illegal activities of defendant Exchange Bank, certain of its officers, the Kitzers, the Minnesota Insurance Commissioner, together with

other attendant litigation, and the resulting insolvency of American Allied. Further publicity concerning the same subject matter appeared on September 14, 17 and 18, 1965. Deposition testimony of Jensch, plaintiff's executive director, and of Lewis, its counsel, was also revealing of National Family's pre-September 23, 1965, awareness or cause for awareness of defendant Exchange Bank's alleged fraudulent activities.

Without further detailing the evidence, we are satisfied that the district court was amply justified in finding and holding that plaintiff knew or should have known of its cause of action against defendant more than five years prior to filing its complaint on September 23, 1970.

Finally, plaintiff makes the belated contention that this case presented an issue of fact which should have been determined by a jury since it had originally filed a notice of demand for a jury trial. This charge is without merit and is raised for the first time in the instant appeal. The district court did not act summarily and refused to determine the limitations issue by summary judgment. It handed down a memorandum opinion to that effect on May 3, 1971. At that time it ordered a factual hearing solely to determine the limitations issue. This second hearing was held on June 9, 1971, and was resumed to completion on June 23, 1971. Plaintiff not only made no objection to this procedure but approved and fully participated in it by presenting witnesses, documentary evidence and arguments on its own behalf.

Quite aside from any question of plaintiff's right to a jury trial on the limitations issue on a motion to dismiss, it is now too late for plaintiff to raise this question for the first time on appeal. Brown v. Wisconsin State Department of Public Welfare, 7 Cir., 457 F.2d 257, 259 (1972); Desert Palace, Inc. v. Salisbury, 7 Cir., 401 F.2d 320, 324 (1968). Cf. Washington Gas Light Co. v. Virginia Electric & Power Co., 4 Cir., 438 F.2d 248, 250 (1971).

Further, this procedural question is a matter governed by federal law, and there is ample authority that if any such right existed, plaintiff waived it by proceeding to the trial of that issue before the court without objection. Kearney v. Case, 79 U.S. (12 Wall.) 275, 284, 20 L.Ed. 395 (1871); Smith v. Cushman Motor Works, Inc., 8 Cir., 178 F.2d 953, 954 (1950). See also Bradley v. Maryland Casualty Co., 8 Cir., 382 F.2d 415, 420 (1967) (written by then-Circuit Judge Blackmun). Cf. Maytag Co. v. Meadows Manufacturing Co., 7 Cir., 45 F.2d 299, 301–302 (1930), cert. denied, 283 U.S. 843, 51 S.Ct. 489, 75 L.Ed. 1452 (1931).

Finding as we do that the limitations issue was correctly determined on its merits and that the procedural issue is without substance, the judgment of dismissal is affirmed.

Affirmed.

PELL, Circuit Judge (dissenting).

The well expressed opinion of Judge Hastings in my view correctly and succinctly sets forth the factual picture and legal issues in this appeal and reaches the proper result on the claim of right to a jury trial. Respectfully, however, I am unable to agree with the determination reached as to the principal issue and therefore dissent from that portion of the opinion.

That issue, as to which there seems to be no disagreement as to what it is, is whether prior to September 23, 1965, the plaintiff insurance company discovered or with reasonable diligence should have discovered the alleged fraudulent misrepresentations made by the defendant bank to the Minnesota Department of Insurance as to the financial condition of American Allied.

The district court did not find actual knowledge as I read its opinion, and the question remains whether there was con-

structive notice.[1] The district court finds a sufficient basis for constructive notice in the fact, which was obvious to all interested parties, that American Allied was insolvent. It appears to me, however, that there is an insurmountable gap between knowledge of the insolvency of A and being put on notice that B had misrepresented that solvency.

The majority opinion basically relies on the fact that the defendant bank was sometimes mentioned in the abundant newspaper publicity concerning the defalcations of American Allied's agents and representatives. This was not, however, the basis on which the district court, which had all of the evidence before it, determined the issue. The district court simply stated, "The operative facts which put National Family on notice of their cause of action here are the evidences of insolvency of American Allied *and nothing else.*" (Emphasis added.)

It is not uncommon for con artists, corporate or individual, to utilize innocent banking institutions in connection with their machinations. Funds are deposited, shifted, withdrawn, put into blind accounts and otherwise maneuvered, often with great expedition. Loans including mortgages are often made to those with impure hearts because of a lack of knowledge thereof by the lending bank. In short, because a customer of a bank has had his acts of fraud and insolvency exposed does not implicate the lending or depository bank with knowledge thereof. I cannot therefore agree with the district court's apparent holding that just because the plaintiff knew American Allied was insolvent it should have been aware that the defendant bank might have been implicated.

Conceding, however, that if the record shows other facts, even though not relied upon by the district court, justifying constructive notice we must affirm, I turn to that upon which the majority opinion relies, *i. e.,* the newspaper publicity in which the name of the defendant bank was mentioned and certain depositions.

In my opinion, and respectfully to the analysis of Judge Hastings, these did not serve as a flag of implication. I would venture the opinion that the district judge may have so thought when he did not base his decision on the fact that publicity had mentioned the defendant bank.

While there were numerous newspaper articles which clearly established that American Allied was on a collision course with financial disaster, the defendant bank was not named in many of these articles.

The transfer of funds to "an unauthorized Chicago bank account" can mean no more in my opinion than that a deposit was made without necessary American Allied corporate authority. This might indicate that the bank was not sufficiently insistent upon corporate resolutions but would scarcely implicate the bank in any fraudulent machinations.

I cannot find that the newspaper articles in June, July or August 1965 informed the public in the St. Paul-Minneapolis area of any illegal activities of the defendant bank or its officials. These articles at most indicated that the bank was a depository of funds of American Allied and had made loans to

---

1. For convenience of reference, I have categorized by the term "constructive notice" factual situations in which there is a lack of actual notice but there is that which in the law is equated with actual notice. This is variously termed "implied notice," "constructive notice," "presumptive or imputed notice." See 66 C.J.S. Notice §§ 5, 6 and 10 at 638, 639 and 642 (1950).

The Ninth Circuit expressed the thought that constructive notice includes "implied notice" and "inquiry notice," the latter apparently being similar to or identical with "implied notice." F. P. Baugh, Inc. v. Little Lake Lumber Company, 297 F.2d 692, 696 (9th Cir. 1961), cert. denied, 370 U.S. 909, 82 S.Ct. 1256, 8 L.Ed.2d 404 (1962).

it. An article on July 12 states that Kitzer, Senior, took funds from one of the companies and pledged the securities to the Exchange National Bank of Chicago to cover personal loans. This indicates a defalcation on the part of Kitzer but does not reflect that any bank had any knowledge that he was using other than his own personal assets.

An article of July 20, 1965, stated that Kitzer, Senior, "pledged securities belonging to the insurance firms as collateral for personal loans at a bank. The bank sold the bonds when Kitzer defaulted on his notes, but policy holders of the Bell firms have brought suit against the bank claiming it had no right to sell the bonds."

Here the bank involved is not identified and at most, even assuming that plaintiff's representatives should have been aware that the bank was the defendant bank, there is no showing that the bank was not properly taking steps to collect a loan which it had made on a bona fide basis.

An article of July 24, without identifying any bank specifically, stated that funds were being shifted between the Twin Cities and the Chicago, Illinois banks. There is no showing that whatever bank it may have been was aware of the shifting.

In an article of August 8, there is a vague reference to "the unexplained shift of $1.1 million in company money from St. Paul to Chicago, where the Kitzers headquartered." The same article, again without identifying the bank stated: "He alleged that $200,000 in securities listed as company assets had been transferred to a Chicago bank and placed in Kitzer's personal account or the account of someone named by him."

On August 13, an article reflected that a grand jury had subpoenaed records from two named banks in Minneapolis and had also subpoenaed "two officials of a Chicago, Illinois, bank and a New York, N.Y., investment firm."

On August 21, 1965, a suit was brought to foreclose a mortgage on the American Allied Building and the defendant bank is mentioned as the original mortgagee. Again, there is no showing other than a bona fide transaction. The article indicated that there would be a claim as to the legality of the mortgage but it is not an uncommon occurrence for dissident creditors to attempt to set aside liens which would otherwise make their claims less collectible.

In an article of September 10, 1965, an Illinois Insurance Department examiner was quoted as stating that certain money could not be properly considered as an asset of the American Allied firm "since it was prepledged to the bank which granted Kitzer's loan." Thus, as late as September there was some authoritative indication that the bank which had granted Kitzer's loan was doing so within the limits of proper banking practice.

It was not until an article of September 17, 1965 (five years and six days before the filing of the complaint here involved) that there was any specificity with regard to possible involvement of the defendant bank. An article of September 17 related that several suits had been filed against American Allied and its officers. One of these named the defendant bank as a party. With regard to the suit, the article stated the following: "It is alleged that the bank paid over the money to the Kitzers knowing that they were borrowing it for 'their own personal use.' It also is claimed that the Chicago bank assigned the mortgage to Mrs. Brown while proceedings were pending before Pearson to have the company declared insolvent."

An article the next day also referred to the same suit and mentioned the further claim that the bank had assigned the mortgage to a Mrs. Brown while insolvency proceedings were pending.

The bank was charged, in still another article of September 18, with knowing that the Kitzers were borrowing for their own personal use. Finally, on September 21, an article stated that a vice-

president of the defendant bank was expected to appear that day before the federal grand jury investigating the collapse of American Allied. This, of course, on the surface presents nothing more than the usual situation of calling in, where fraudulent financial schemes are involved, those who were acquainted with the financial affairs of the defrauding party. It has often been utilized as an initial source of inquiry.

While regretting the necessity of lengthening this dissent by the foregoing analysis, I have found it to be necessary to show that there was not, in my opinion, sufficient to establish a duty of diligent inquiry but at most there were suspicious but highly ambiguous circumstances of merely possible involvement of the defendant bank. Even the status of being suspicious did not really occur until about September 14. An analogous situation was reported in Grant v. National Bank, 97 U.S. 80, 24 L.Ed. 971 (1877), where the Court held that to invalidate a fraudulent preference the creditor must have had such knowledge of facts as to induce a reasonable belief of the debtor's insolvency and it was not sufficient that he had some cause to suspect such insolvency.

The case is of double significance here because it also involved a bank dealing with one who was found out to be insolvent. The Court summarized the situation at page 82:

"The circumstances calculated to excite their suspicions are very ably and ingeniously summed up in the brief of the appellant's counsel; but we see nothing adduced therein which is sufficient to establish any thing more than cause for suspicion. That Miller borrowed money; that he had to renew his note; that he overdrew his account; that he was addicted to some incorrect habits; that he was somewhat reckless in his manner of doing business; that he seemed to be pressed for money,—were all facts well enough calculated to make the officers of the bank cautious and distrustful; but it is not shown that any facts had come to their knowledge which were sufficient to lay any other ground than that of mere suspicion."

With regard to the matter of the general test here applicable for imputing notice, the Tenth Circuit in Southwestern Petroleum Corporation v. Udall, 361 F.2d 650, 657 (10th Cir. 1966), stated:

"We agree that the test for imputing notice of a superior right is generally whether facts are sufficient to put an ordinarily prudent man on inquiry, an inquiry which, if followed with reasonable diligence, would lead to the discovery of defects in the title or of equitable rights of others affecting the property. *The test is not what an extremely cautious person might do, but what a prudent one should do.* Charles v. Roxana Petroleum Corp., 282 F. 983 (8th Cir.), cert. den. 261 U.S. 614, 43 S.Ct. 361, 67 L.Ed. 827.

"The existence of other later offers is not such a fact as to put Lowe on notice that a conflicting claim exists. This is a common situation which in itself should cause no suspicion." (Emphasis added.)

Further, it is to be noted that a respectable body of authority recognizes as "a broad, general proposition . . . that no one is chargeable with constructive notice of a statement, advertisement, or other matter printed in a newspaper, in the absence of a statute expressly authorizing such publication and declaring the effect of a compliance with its terms, or unless it is seen by the person to be charged." 58 Am.Jur.2d Notice § 17 (1971). Here there was no contention that any statute was applicable and there was a substantial doubt in the record as to the awareness of plaintiff's representatives of the newspaper references to the defendant bank although it was clear they were aware of the insolvency of American Allied on which the district court rested its decision.

In my opinion there was not a sufficient basis in the newspaper articles to cause even suspicions that the bank was

improperly involved with American Allied. In other words, an ordinarily prudent man would not have been put on inquiry as to the bank.

I would reach the same result as to the deposition testimony of Jensch and Lewis. Jensch testified that he may have been aware of the fact that the defendant had been mentioned in the newspaper articles but he assumed that the bank lent money to the Kitzers or were their financial backers or something like that. The deposition itself indicated that Jensch had attended a number of sessions of the insolvency trial and did make inquiries of a number of people but did not get very far asking questions. Apparently none of these questions were directed toward the bank because the name was not familiar to him. As far as Jensch's testimony is concerned, I find no indication of any fact which would have caused him to think that the hearing or newspaper references to the defendant bank were other than that American Allied had an account at the bank and that the bank was attempting to protect collateral it had on a loan.

It appears to me that the indicia of fraudulent concealment on the part of the defendant bank were so minimal as to fall within the orbit of the principle stated in 54 C.J.S. Limitations of Actions § 189 at 193 (1948):

"The courts will not lightly seize on some small circumstance to deny relief to a party plainly shown to have been actually defrauded against those who defrauded him, on the ground that he did not discover the fact that he had been cheated as soon as he might have done; it is only where the party defrauded should plainly have discovered the fraud except for his inexcusable inattention that he will be charged with a discovery in advance of actual knowledge on the subject."

Here, of course, the plaintiff has been denied by the limitations bar the opportunity of showing that it had been defrauded.

A person is only charged with the knowledge which proper inquiry would disclose where he has *reasonable grounds* for suspecting or inquiring, but here, there being a wide difference between suspicion and knowledge, evidence that there existed a suspicion in a person's mind is not equivalent to evidence of notice. 58 Am.Jur.2d Notice § 13 (1971).

Even if it were to be assumed that there was such a reference to the defendant bank in the newspaper article of September 17, in which knowledge of improprieties on the part of American Allied by the bank was first specifically stated, in my opinion, the statute did not start running from the raising of the first flag of suspicion. This brings into play a rule of law which appears to me to be a matter of first impression in the State of Illinois. However, this is merely an extension of the general rule which there is no reason for thinking Illinois would not follow. This rule, which might be termed "a reasonable period for inquiry" rule in the context of a statute of limitations situation, is stated in United States v. Booth-Kelly Lumber Co., 246 F. 970, 972 (D.Or.1917), as follows:

"Notice and knowledge of the fraud will set the statute in operation. No one questions the principle. But a party claiming fraud and lack of knowledge concerning it may be guilty of laches in ascertaining its existence, which will preclude him from asserting want of knowledge, where he has been let into facts and circumstances which are calculated to put a reasonably intelligent man upon inquiry as to the main fact, which inquiry, if seasonably pursued with reasonable diligence, would lead to a discovery of such main fact. Stated generally, the rule is that whatever puts a party upon inquiry amounts, in judgment of law, to notice, provided the inquiry becomes a duty and would lead to a knowledge of the real facts by the exercise of ordinary intelligence. *The*

*circumstances known to him must be such as ought reasonably to have excited his suspicion and led him to inquiry, and he must be allowed a reasonable time within which to make such inquiry before being affected with notice.*" (Emphasis added.)

The principle is recognized in 66 C.J. S. Notice § 11b(3) as follows:

"A person put on inquiry by facts is to be allowed a reasonable time in which to make such inquiry before being affected with notice. Neither law nor equity will impute to a person a knowledge of facts which he has not had a reasonable opportunity to ascertain. What constitutes a sufficient lapse of time for notice depends on the circumstances of the case." (Footnotes omitted.)

The general rule has been stated in Nettles v. Childs, 100 F.2d 952, 957 (4th Cir. 1939), "if a person has actual knowledge of facts which would lead an ordinarily prudent man to make further investigation, the duty to make inquiry arises and the person is charged with knowledge of the facts which inquiry would have disclosed." The logical extension of the rule would appear to be that he should not be charged with knowledge prior to inquiry or prior to a reasonable period of time which would be necessary for inquiry. To hold otherwise would be to place the person without actual knowledge in a less advantageous position than the person with actual knowledge.

I recognize that the "reasonable period for inquiry" rule has not been, as far as I have been able to discover, the subject of particularized application but only of general enunciation. The cases examined, however, have not evolved from close timewise situations such as the present case and there had not been a necessity for application of the rule. I also recognize in respect to the rule it could be argued that, once the waving flag is up, the prospective litigant has

five years in which to inquire and to institute his suit, an arguably reasonable time. However, the litigant who has actual notice has a full five year statutory period following actual knowledge. I can conceive no valid reason in logic or justice for the prospective litigant in the uncertain and sometimes ambivalent area of fictitious constructive notice having less time, which would be true if he were denied a reasonable time to inquire diligently so as to verify what is at best only a clue.

The general rules of law pertaining to the imputing of knowledge following information or knowledge of certain extraneous facts which of themselves do not amount to, nor tend to show, actual notice, but which are sufficient to put a reasonably prudent man upon inquiry are summarized in 58 Am.Jur.2d Notice §§ 8 and 9 (1971). The text points out, however, that there must also be such circumstances that the inquiry, if made and followed up with reasonable care and diligence, would lead to the discovery of the truth, a questionable inference on the record before us. Finally, the Am.Jur. text recognizes the necessity of reasonable time for inquiry: "A reasonable cause to know is not equivalent to knowledge. Neither law nor equity will impute to a person knowledge of facts which he has not had a reasonable opportunity to ascertain." 58 Am. Jur., *supra,* § 9.

It is obvious from the record in this case that the machinations of the top officials of American Allied had produced a complicated and murky picture involving dealings with several banks. Certainly the picture had not been brought into focus by September 23, 1965, in Minneapolis where a grand jury had been in session along with various suits and proceedings over the summertime. The state Insurance Commissioner was involved, and answers continued to be elusive.

I cannot see from the examination of the record that diligent inquiry would

have produced knowledge of the defendant bank's involvement even if inquiry had commenced a month or two before that date. Accordingly, I would hold that the statute of limitations did not commence until some time after September 23, 1965, and therefore that the suit was timely filed.

I have little patience with or sympathy for litigants who wait until the eve of the date when arguably the time of limitations might be considered as having expired, although it is not clear from the record when the first date became reasonably knowable that the defendant bank was involved. In any event, the statute of limitations allows five years in the case of fraudulent concealment and I do not conceive that the plaintiff here received its legal allowance.

The majority opinion determines as a matter of law that the action was filed beyond the statutory period of limitations. I would have determined as a matter of law that upon either of two bases the statutory period had not expired. Neither of the court's opinions relies on the basis of the district court's determination. Therefore, at the very least it would appear to me that there should be a reversal and a remand to determine factually, and not as a matter of law, whether there was a basis for a reasonably prudent person to have been alerted that the defendant bank might be improperly involved with American Allied, and, if so, specifically when the duty to exercise diligent inquiry arose and what would be a reasonable time thereafter in which to make the inquiry. Inasmuch as the district court's decision rested on an incorrect ground, the record is questionably complete to supply the answers to the above essential questions.

I have herein addressed myself only to the limitations question and, of course, express no opinion as to whether there was an otherwise valid cause of action for fraudulent concealment stated in the plaintiff's complaint.