In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-3079

PEOPLES NATIONAL BANK, N.A.,

*Plaintiff-Appellant*,

*v.*

BANTERRA BANK, CORT JONES AND LISA JONES,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:12-cv-00045-DRH—**David R. Herndon**, *Chief Judge*.

ARGUED FEBRUARY 14, 2013—DECIDED MAY 20, 2013

Before KANNE and WILLIAMS, *Circuit Judges*, and
ZAGEL, *District Judge*.*

ZAGEL, *District Judge*.    Two banks disagree over
creditor priority in connection with a mortgage. Cort

* The Honorable James B. Zagel, United States District Court
for the Northern District of Illinois, Eastern Division, sitting
by designation.

and Lisa Jones, the debtors underlying this dispute ("Debtors"), unsurprisingly take no position in this matter.

## I. BACKGROUND

On November 1, 2004 Peoples National Bank ("Peoples") extended Debtors a loan for $214,044.26 ("Peoples Loan 1"). This loan was secured by certain real property in a mortgage dated the same day and recorded on November 5, 2004 ("2004 Mortgage"). In August 2008, Debtors obtained another loan, this time from Banterra Bank ("Banterra"). This $296,000 construction loan was secured with a second mortgage on the same property that secured Peoples Loan 1. This mortgage was dated August 28, 2008 ("2008 Mortgage") and was recorded on September 3, 2008. Banterra was aware of the first mortgage Debtors granted to Peoples and does not dispute that Peoples' security interest in the property takes priority over Banterra's with respect to Peoples Loan 1.

What Banterra did not know was that on November 26, 2007, Debtors obtained a second loan from Peoples ("Peoples Loan 2"). This loan was for $400,000.00 and was secured by a different piece of real property in another mortgage recorded on December 14, 2007 ("2007 Mortgage"). The 2007 Mortgage made no mention of the property that secured Peoples Loan 1 or the Banterra loan.

Banterra's difficulties arise from a cross-collateralization clause present in the Peoples Loan 1 mortgage docu-

ment. The clause appeared on the first page of the document and stated:

> **CROSS-COLLATERALIZATION.** In addition to the Note, this Mortgage secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise and whether recovery upon such amounts may be or hereafter may become barred by any statute or limitations and whether the obligation to repay such amounts may become otherwise unenforceable.

The mortgage also contained the following relevant clauses:

> **MAXIMUM LIEN.** At no time shall the principal amount of the Indebtedness secured by the Mortgage, not including sums advanced to protect the security of the Mortgage, exceed $214,044.26.

> **Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts costs and expenses payable under the Note or Related Documents, together with all renewals or extensions of, modifications of, consolidations of and substitutions

for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage. Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Mortgage.

**Note.** The word "Note" means a note in the amount of $214,044.26 dated November 1, 2004, and all renewals, modifications, and extensions thereof. NOTICE TO GRANTOR: THE NOTE CONTAINS A VARIABLE INTEREST RATE.

On the face of the mortgage, the real estate property offered by Debtors to secure Peoples Loan 1 was also to serve as collateral for all other "obligations, debts and liabilities, plus interest thereon, of Grantor to Lender . . . whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note . . . ." Peoples Loan 2 appears to be just such a debt. To be sure, the maximum lien clause serves to limit the amount of indebtedness that the property can secure. And the maximum indebtedness permitted by the clause was equal to the amount of the initial loan. At the inception of the mortgage agreement, then, there was no room under the cap for the collateral to secure any subsequent debts that may have arisen. The extent of that encumbrance would immediately change,

however, the moment that Debtors began to pay down the initial loan. And that is precisely what happened.

On December 21, 2010 Debtors filed a voluntary Chapter 11 bankruptcy petition. On that day, the balance due on Peoples Loan 1 was $115,044.26. Debtors received permission from the Bankruptcy Court to sell the property securing the loan. The property sold on May 31, 2011 for $388,500.00. Out of these proceeds, Peoples asserts that it is entitled to extract the balance due on Peoples Loan 1, as well as, by virtue of the cross-collateralization clause, partial payment of Peoples Loan 2, up to the $214,044.26 cap. Banterra contends that the cross-collateralization clause, insofar as it purports to secure Peoples Loan 2 ahead of subsequent creditors, is invalid and ineffective.

Peoples filed a complaint in Bankruptcy Court requesting that the Court determine the priority of the parties' liens. *In re Jones,* 2011 WL 6140686 (Bankr. S.D.Ill. Dec. 9, 2011). The Bankruptcy Court found in favor of Peoples. Banterra appealed to the District Court, where Banterra prevailed. *Peoples Nationals Bank, N.A. v. Jones*, 482 B.R. 257, 264 (S.D. Ill. 2012). Peoples now appeals the District Court's decision.

## II. ANALYSIS

This action occurred in Illinois and pertains to Illinois property. The parties agree that Illinois law therefore applies here. *See also United States v. 19.86 Acres of Land*

*in East St. Louis, St. Clair County, Ill.*, 141 F.2d 344, 346 (7th Cir. 1944).

It is undisputed that Banterra did not have actual notice or knowledge of Peoples Loan 2. It is similarly undisputed that Banterra did have actual notice and knowledge of Peoples Loan 1, the mortgage securing it, and the cross-collateralization clause that it conspicuously[1] contained. The dispute is over the legal significance of these two facts. The relevant facts are thus agreed to; our review of the Bankruptcy and District Courts' conclusions of law is *de novo*. *Freeland v. Enodis Corp.*, 540 F.3d 721, 729 (7th Cir. 2008); *In re Rivinius, Inc.*, 977 F.2d 1171, 1175 (7th Cir. 1992).

Banterra has consistently argued that, under 765 ILCS 5/11, the 2004 Mortgage was insufficient as a matter of law to impart record notice of Peoples Loan 2 on subsequent creditors or purchasers. Section 11 does appear to provide something of a checklist of pieces of information for inclusion in a valid mortgage. But is the checklist statutorily required? Banterra asserts that it is, and that a mortgage lacking any of these details does not impart record notice on a subsequent bona fide purchaser. Section 11 states:

> Mortgages of lands may be substantially in the fol-lowing form:

---

[1] As the Bankruptcy Court noted, "the cross-collateralization clause was conspicuously placed on the first page of that mortgage and even a cursory review of the document could have revealed its existence." *In re Jones*, 2011 WL 6140686, *8.

The Mortgagor (here insert name or names), mortgages and warrants to (here insert name or names of mortgagee or mortgagees), to secure the payment of (here recite the nature and amount of indebtedness, showing when due and the rate of interest, and whether secured by note or otherwise), the following described real estate (here insert description thereof), situated in the County of . . ., in the State of Illinois.

On the face of it, use of the word "may" suggests that Peoples has the better of it, and that the statute's provisions are at most aspirational. On the other hand, longstanding Illinois case law seems to hold that a mortgage must at least include the amount of indebtedness the mortgage is meant to secure in order to impart record notice.[2] *See Bullock v. Battenhausen*, 108

---

[2] We note that, several months after this appeal was filed, the Illinois legislature provided clarification on the question of whether the provisions of 765 ILCS 5/11 are permissive or mandatory. Illinois Public Act 97-1164, which is the enacted form of Senate Bill 16, became law on or about February 8, 2013. Section 20(b) of the Act states:

The provisions of [765 ILCS 5/11] regarding the form of a mortgage are, and have always been, permissive and not mandatory. Accordingly, the failure of an otherwise lawfully executed and recorded mortgage to be in the form described in [765 ILCS 5/11] in one or more respects, including the failure to state the interest rate or the maturity date, or both, shall not affect the validity

(continued...)

Ill. 28, 37 (1883); *Bergman v. Bogda*, 46 Ill.App. 351, 357
(1st Dist. 1892); *Flexter v. Woomer*, 46 Ill.App.2d 456, 458-
59 (5th Dist. 1964). On the facts here, however, we see
no need to enter this fray.

Citing *Bullock*, *Bergman*, and *Flexter*, Banterra asserts
that, when a mortgage does not at least list the precise
amount of indebtedness the collateral means to secure,
a subsequent creditor without actual notice of the mort-
gage will not be held to record notice. But even if
true, that precedent does not address the dispositive
question presented here. In each of the cited cases, the
Courts found that the subsequent purchaser was with-
out actual notice or knowledge of the prior interest at
issue, *and* there was no indication that the subsequent
purchaser possessed any information that should have
prompted an investigation likely to result in the
discovery of that interest. Given the facts, none of the
Courts had occasion to consider whether the subse-
quent purchasers should be held to inquiry notice.
That is not so here.

Like record notice, inquiry notice is essentially a form
of constructive notice. *See Pelfresne v. Village of William
Bay*, 965 F.2d 538, 542 (7th Cir. 1992); *National Family
Ins. Co. v. Exchange Nat. Bank of Chicago*, 474 F.2d 237, 241-
42 n.1 (7th Cir. 1973); 112 Am. Jur. Proof of Facts 3d 419

---

(...continued)
  or priority of the mortgage, nor shall its recordation be
  ineffective for notice purposes regardless of when the
  mortgage was recorded.

§ 12 (2013) (collecting cases); 1 PATTON AND PALOMAR ON LAND TITLES § 12 (3d ed. 2012) (collecting cases). Record notice rules treat a subsequent creditor with no actual knowledge of a prior interest as having actual notice if the prior interest was properly recorded. A subsequent creditor receives no quarter for having failed to search the relevant real estate records, so long as the interest was properly recorded. Inquiry notice operates under a similar principle.

> Inquiry notice describes the situation where the transferee has been made aware of facts or circumstances from which the existence or possibility of a prior claim might reasonably be inferred. If so, the purchaser then has a duty to verify or dispel the inference through further inquiry. If he fails to make inquiry, he is nonetheless chargeable with knowledge of facts that a diligent inquiry would have disclosed, the same as if he had acquired actual knowledge of those facts.

*In re Shara Manning Properties, Inc.*, 475 B.R. 898, 906 (Bankr. C.D.Ill. 2010); *see Smith v. Grubb*, 402 Ill. 451, 464-65 (1949); 112 Am. Jur. Proof of Facts 3d 419 § 12 (collecting cases).

Here, we find that the Bankruptcy Court correctly identified the dispositive question presented by these facts when it asked "whether actual notice of a cross-collateralization clause in a mortgage imparts inquiry notice as to the existence of other obligations that may be covered by the security instrument."

*In re Jones*, 2011 WL 6140686, *8 (Meyers, Bankr. J.). On these facts, we hold that it does.

Banterra concedes its actual notice of Peoples Loan 1 and the mortgage securing it. The cross-collateralization clause is conspicuously placed on the first page of the mortgage, discoverable with just a cursory review of the document. *Id.* The clause states expressly that, in addition to Peoples Loan 1, the collateral secured all debts of the grantor to the lender "now existing or hereafter arising." Of this Banterra was aware and "from [this] the existence or possibility of a prior claim might reasonably be inferred." Moreover, it is clear that a reasonable investigation would have disclosed this prior claim.[3]

---

[3] It is undisputed that a name search of the Jefferson County land records would have revealed the existence of Peoples Loan 2. Banterra wonders skeptically whether, under Peoples' theory, the investigation required of one put on inquiry notice might entail searching records, not just in Illinois counties, but in every county in neighboring states as well. But the law requires reasonable investigation, not endless investigation, and a party allegedly on inquiry notice can rebut the argument by showing that a reasonable investigation did not yield discovery of the relevant information. *Jesko v. American-First Title & Trust Co.*, 603 F.2d 815, 818-19 (10th Cir. 1979); 112 Am. Jur. Proof of Facts 3d 419 § 12 (2013) (collecting cases); 1 PATTON AND PALOMAR ON LAND TITLES § 12 (3d ed. 2012) (collecting cases).

Ultimately, where to draw that line will be a question for the trier of fact. Here, however, the Bankruptcy Court found,

(continued...)

Banterra never argues that Peoples Loan 2 would not have been discovered upon reasonable investigation. Banterra simply asserts that, due to "inherent contradictions and ambiguities," the mortgage and cross-collateralization clause did not create a duty of inquiry in the first place. Although the District Court thought so, we fail to see any inconsistency or ambiguity. The mortgage is not susceptible of two meanings. It identifies a piece of real property that serves to secure a loan from Peoples to Debtors in the amount of $214,044.26, as well as any additional loans Peoples and Debtors may enter into, subject to a specified maximum amount of indebtedness.

The mortgage expressly defined the term "indebtedness." Banterra believed "the 'Indebtedness' clause defined the secured debt as the 'Note,' which was defined to mean 'a note in the amount of $214,044.26 dated November 1, 2004, and all renewals, modifications and extensions thereof.'" *Peoples Nationals Bank*, 482 B.R. at 264. Were this the complete definition of "Indebtedness" under the mortgage, Banterra might have a better argument that the mortgage was internally inconsistent—if the indebtedness contemplated by the mortgage consisted solely of the Note, one might ask, what

—————————————

(...continued)

and the parties do not dispute, that the investigation required to have discovered Peoples Loan 2 was within the bounds of reasonableness. *See In re Jones*, 2011 WL 6140686, *9.

further indebtedness could be secured by virtue of the cross-collateralization clause?

But this reading of "Indebtedness" is inaccurate—the mortgage itself defined "Indebtedness" to mean the Note *and* "all amounts that may be indirectly secured by the Cross-Collateralization provision of this Mortgage." Accordingly, in stating that "[a]t no time shall the principal amount of the Indebtedness secured by the Mortgage . . . exceed $214,044.26," the mortgage clearly contemplated indebtedness arising from both the original Note and any indebtedness secured by the cross-collateralization clause. The clauses are entirely complementary.

Banterra makes much of the fact that the mortgage set the maximum amount of indebtedness at $214,044.26— the same amount as the initial loan. At the inception of the agreement between Peoples and Debtors, Banterra observes, the amount due on the initial loan was equal to the maximum indebtedness allowed by the mortgage, and the mortgage thus could secure no further debt.

Banterra's observation is of no import in the context of this case. That the initial loan was equal to the maximum indebtedness allowed by the mortgage does not allow the inference that the mortgage could never secure any other debt even when the initial loan has been reduced by payments.

The cross-collateralization clause expressly contemplates debts arising in the future, when Debtors may well have paid down some of the initial loan, creating room under the cap. Nothing in the case

explains why this entirely plausible scenario (indeed, it is precisely what happened) should be outside the set of possible outcomes considered by anyone reading the document. Because it is self-evident that the parties intended that the amount of indebtedness under the initial loan would be paid down by Debtors over time, we cannot agree that setting the maximum amount of indebtedness equal to the amount of the initial loan "evidence[s] an intent that the mortgage not secure any other debt." *Peoples Nationals Bank*, 482 B.R. at 264.

Banterra argues that long-held Illinois case law weighs in their favor, arguing that if this Court sides with Peoples, *Bullock*, *Bergman*, and *Flexter* are all "de facto overruled." We do not agree. None of the facts in those precedents occasioned their respective Courts to consider inquiry notice. The Appellate Court in *Bullock*, the seminal case of the three, was explicit: "The rule that what is sufficient to put a purchaser upon inquiry is notice of whatever the inquiry would have disclosed has no application." *Battenhausen v. Bullock*, 11 Ill.App. 665, 671 (1st Dist. 1882).

In *Bullock*, the issue was whether a trust deed containing "no statement of the amount of the indebtedness thereby sought to be secured" was legally sufficient to impart record notice on a subsequent purchaser. *See id*. at 668. Inquiry notice had no application in *Bullock* because the subsequent purchaser was found to have no actual knowledge or notice of the trust deed. *See id*. at 671 ("[inquiry notice] applies to actual and not to constructive notice"). That is, the subsequent purchaser

had no actual knowledge or notice of the piece of recorded information which, while perhaps insufficient as a matter of law to impart record notice, could well have imparted inquiry notice.

That is not so here, where the cross-collateralization clause is the analog to the trust deed. In this case, Banterra had actual knowledge of the cross-collateralization clause. The clause may well have been insufficient to impart record notice of Peoples Loan 2 on a subsequent creditor who did not have actual knowledge of that loan—that is *Bullock*. But it is clear that the clause does impart *inquiry* notice on a subsequent creditor who has actual knowledge of the *clause*—a point not reached by *Bullock*.

The same is true of *Flexter* and *Bergman*. In *Flexter*, the analog to our cross-collateralization clause was a mortgage in its entirety. *See Flexter*, 46 Ill.App.2d at 457. The Appellate Court acknowledged that there was conflicting evidence at trial as to whether the subsequent purchaser had actual knowledge of the mortgage, but ultimately concluded that there was no reason to disturb the trial judge's finding that he did not. The mortgage did not recite the amount of indebtedness it was meant to secure, and, following *Bullock*, the Court concluded that the mortgage was legally insufficient to impart record notice.

This is not to say that, had the subsequent purchaser been found to have had some knowledge of the prior interest, he could not have been held to inquiry notice.

Neither *Flexter* nor *Bullock* held that a document that is legally insufficient to impart record notice is also precluded from imparting inquiry notice. For the principle of inquiry notice to be applicable, however, the subsequent purchaser must in fact have actual knowledge of some relevant piece or pieces of information that would put him or her on inquiry. *See Battenhausen*, 11 Ill.App. at 671. In *Flexter*, as in *Bullock*, the subsequent purchaser was found to have no such knowledge, so the Court did not reach the question.

In *Bergman*, too, the Court found that a mortgage that did not include the amount of indebtedness it was meant to secure was legally insufficient to impart record notice. *Bergman*, 46 Ill.App. at 357. Again, however, whether the subsequent purchaser might still have been charged with inquiry notice was not addressed by the Court. The subsequent purchaser was found to have had no actual knowledge of the mortgage, nor any further information that might have put him on inquiry. As in *Bullock* and *Flexter*, inquiry notice simply was not at issue.

Banterra's misapprehension of this line of cases is succinctly captured in its brief at page 33, where Banterra states ". . . when *Bullock*, *Bergman*, and *Flexter* were decided, each court held that a mortgage which did not describe the specific amount of debt secured was not record notice, and hence, did not place subsequent mortgagees on notice or inquiry as to the extent or validity of such defective mortgages." The first clause has it quite right—those courts did indeed hold that

mortgages that do not describe the specific amount of debt secured do not impart record notice.

The assertion made in the second clause, however, overreaches and does not follow from the first. Again, not one of those Courts found that because a mortgage is insufficient to impart record notice, it is necessarily also insufficient to impart inquiry notice.[4] *Accord In re Shara Manning Properties*, 475 B.R. at 906 ("a subsequent transferee who attacks a prior instrument as ineffective to accord constructive notice may still lose a priority battle if he had actual or inquiry notice of the instrument or the interest conveyed thereunder"); *see also* 14 Richard R. Powell, POWELL ON REAL PROPERTY § 82.02[1][d][i] (LexisNexis Release 91 2000). Indeed, none of the subsequent purchasers were found to have had actual knowledge of the information that might have put them on inquiry notice. As discussed above, there was thus no reason for the courts even to address the question.

Finally, as a matter of policy Banterra laments that the position we adopt today will chill lending and commerce, making it more difficult for third-party lenders like Banterra to confidently approve loans secured by

---

[4] The District Court did ultimately conclude that the 2004 Mortgage was insufficient as a matter of law to impart inquiry notice that it secured any debt other than the Note. *Peoples Nationals Bank*, 482 B.R. at 265. The Court's analysis, however, appears to address only the legal sufficiency of the mortgage to impart *record* notice. *Id.* at 263-65.

property that has been cross-collateralized. As a general matter, we should think that prudent lenders would do well to exercise caution before accepting a second mortgage on real property that has been cross-collateralized. But the more salient response to Banterra's concern is that adopting its position will not in any event dispel the chilling effect—it will merely transfer it between the parties.

A cross-collateralization clause makes a given security interest more valuable to the grantee. The position Banterra urges would reduce that value, shifting it away from the initial grantee and to prospective subsequent grantees.[5] In either case, one lender's incentive to lend is increased, while the other's is reduced. Between the two, however, only one outcome has the virtue of being consistent with the plain contractual

---

[5] This point brings out in sharp relief the illusory nature of Banterra's assurance that, while the position it urges would invalidate such cross-collateralization clauses as to third-parties without actual notice, the clause would remain effective as between the initial lender and borrower. To that extent, Banterra's theory may well leave the security interest Lender has in Debtor's property intact. But the value of that interest to Lender would change dramatically. What is more, the reckoning occasioned by this change in value is not a mere potentiality realized only upon a bankruptcy when a creditor priority dispute ensues. On the contrary, the value of every company in possession of security interests bolstered by such cross-collateralization clauses would immediately drop.

language that the parties agreed upon, and we think it more sensible to allow sophisticated parties to contract as they wish. If cross-collateralization clauses are in the end too costly to borrowers, they need not agree to them.

## III. CONCLUSION

For the foregoing reasons, the judgment of the District Court is reversed, and the judgment of the Bankruptcy Court is affirmed.